IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs March 21, 2018

## STATE OF TENNESSEE v. PHILLIP DANIEL MORTON

**Appeal from the Criminal Court for Davidson County**
**No. 2012-D-3049    Cheryl A. Blackburn, Judge**

_____

### No. M2017-01083-CCA-R3-CD

_____

The Defendant-Appellant, Phillip Daniel Morton, was convicted by a Davidson County jury of first degree murder, for which he received a life sentence. See T.C.A. § 39-13-202. On appeal, the Defendant argues that the trial court erred in denying his (1) petition for writ of error coram nobis and (2) request for a jury charge of voluntary intoxication. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and NORMA MCGEE OGLE, J., joined.

Timothy C. Dunn, Nashville, Tennessee, for the appellant, Phillip Daniel Morton.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Glenn Funk, District Attorney General; and Doug Thurman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

On August 23, 2012, after learning that his ex-girlfriend was assaulted by Keith Gaston, the Defendant shot and killed Gaston, the victim, with a single gunshot to the head while they were at Hard Times Bar & Grill.

As relevant to the issues raised in this appeal, Dr. Adele Lewis, chief medical examiner for Metro Nashville Davidson County, was tendered as an expert in the field of forensic pathology and testified that she performed the autopsy of the victim on August 23, 2012. She concluded that the victim's cause of death was a single gunshot to the back of his head and explained that the gun had to be in contact with the victim's head when he was shot.

Detective Matthew Filter of the Metropolitan Nashville Police Department testified that he was assigned as the lead detective in the shooting, examined the scene, and found the license of Taffney Crowder on the victim's body. Detective Filter recovered video surveillance footage from the bar and described the timeline of the Defendant's and the victim's movements leading up to and after the shooting. Without objection, the video recordings were admitted into evidence and played for the jury.

Exhibit 6 contains thirteen clips from different camera views covering approximately thirteen minutes before the shooting and several minutes afterward. In the clips, the Defendant can be seen moving throughout the bar, walking back and forth from the pool table area, through the bar area, to the dance floor and stage, and eventually into the "cubbyhole" area behind where the victim was sitting. The Defendant's friend, Arnie Cosby, can be seen standing near the opposite end of the bar for most of the night, talking with the Defendant whenever he passed by. Shortly before the shooting, the video recording shows the Defendant waving Cosby over to the cubbyhole area. Once Cosby joins the Defendant, the two men can be seen making their way toward the victim right before the shooting occurs. Specifically, the video recording shows Cosby walking with the Defendant directly behind him until they were directly beside the victim. The victim's date, Victoria Anderson, was in between the victim and the camera during the shooting so it was not immediately evident who shot the victim. Once the shot was fired, Cosby and the Defendant immediately ran away from the victim, and the Defendant can be seen holding a beer in one hand and something under his shirt with his other hand.

On cross-examination, Detective Filter confirmed that the Defendant was "frisked or patted down" when he entered the bar. He confirmed that Shiema Reid was the bartender that night but was not near the cubbyhole area when the shooting occurred. He also confirmed that Robert Parker was working as a photographer at the bar that evening and was standing adjacent to the area of the shooting.

David Martin testified that he was working as a security guard at the bar on the night of the shooting. He confirmed that the Defendant, nicknamed "Rabbit," came to the bar frequently and that, on the night of the shooting, the Defendant appeared angry and told Martin, "I'm going to kill you[,]" while the Defendant was being frisked. He confirmed that there were no security issues with the victim or anyone else in the bar prior to the shooting. On cross-examination, Martin explained that even though the Defendant is known as a "jokester," the Defendant did not appear to be joking and that he took the Defendant's threat seriously.

Samantha Seay, owner of Hard Times Bar & Grill, testified that she was bartending on the night of the shooting with another bartender, Laquinta, and waitress,

Shiema Reid. Seay provided the bar's video recordings to the police and confirmed that the Defendant was a regular patron at the bar and was present the night of the shooting.

Vertricie Willis, the mother of the victim, testified that Taffney Crowder was the victim's live-in girlfriend. Willis said she went to the bar that night with the victim, Victoria Anderson, and Michael McEwen. Willis testified that the Defendant approached her and commented on her appearance, and that she later pointed the Defendant out to the victim to which the victim responded that he knew the Defendant. Willis confirmed that the victim did not have any altercations with anyone at the bar that night. She said she saw the Defendant in the vicinity of the victim shortly before the shooting but that she was not sure of his exact location afterward or who else could have been close enough to shoot the victim.

Victoria Anderson testified that she went to the bar with the victim and his mother and that they were frisked upon entry. She confirmed that Willis pointed out the Defendant and said the Defendant "kept staring at us, watching everything we w[ere] doing." Anderson explained that she and the victim spent some time shooting pool before they eventually made their way to the dance floor area, at which point she saw the Defendant following them. She identified herself as the woman in the video recording standing in front of the victim when he was shot but said she did not notice anything or anyone around them at that time. She confirmed that the victim did not have any altercations with anyone that night.

Taffney Crowder, the victim's live-in girlfriend, previously dated the Defendant. Three to four months before the shooting, the victim and the Defendant "had a few words" after the Defendant offered to buy Crowder a drink while she was on a date with the victim. The day before the shooting, the victim assaulted Crowder and she went to the hospital the next morning; she was placed in a boot on her leg and a sling on her arm. The victim had taken her license and money without her permission so that she would be forced to return to him after their fight. She explained that the Defendant remained friends with her father after they broke up and that the Defendant had dinner with Crowder and her father on the night of the shooting. She learned of the victim's shooting at around 4:00 the next morning and she and her father spoke to the Defendant shortly after. The Defendant told her that he left the bar approximately twenty minutes before the shooting and immediately traveled to Jackson. Although Crowder initially testified that she did not recall telling the police that the Defendant said "he was sorry that happened to [her] and that it was f[--]ked up" once he learned that the victim assaulted her or that the Defendant owned a revolver, the State introduced evidence confirming that Crowder told the police this information immediately after the shooting.

Lisa Whitaker, crime scene technician for the Metropolitan Nashville Police Department, testified that she responded to the scene, prepared a diagram of the bar, took photographs, and processed evidence. She testified that no shell casings were retrieved and opined that the weapon used in the shooting was likely a revolver because it would not eject a shell casing. On cross-examination, Whitaker agreed that she could not definitively state the weapon was a revolver.

Robert Parker testified that he was working as a photographer at Hard Times Bar & Grill on the night of the shooting and identified himself in the video recording near the back door. He said the Defendant originally entered the back door with him while helping him carry in equipment but that the Defendant went back outside and reentered through the front door with security. Approximately forty-five minutes before the shooting, Parker said the Defendant "asked can he have a seat, there was something he wanted to get out of his boot." Parker saw the Defendant remove his boot but did not see if the Defendant took anything out. Parker said the Defendant returned later in the evening and stated, "I'm tired of these n[-----]s around here, I'm about to kill me a mother f[----]r." Parker said he tried to calm the Defendant down because the Defendant indicated someone had "put their hands on" him. Parker said the Defendant asked whether he could exit through the back door and Parker indicated that only security or the bar owner could access that door.

Parker testified that the Defendant had been drinking and appeared to be "nipsy," but that he was not staggering or slurring his speech. He said he had not seen the victim in the bar before and that, although he was facing the victim when he was shot, he was looking at his computer when the victim was killed. He confirmed that he saw the Defendant in the cubbyhole area, about one to two feet from the victim, moments before the shooting. When he heard the shot, Parker said he looked up and saw the Defendant run from the area where the victim was and that the Defendant "had something in one hand and was fumbling with the other hand." He opined that there was no one other than the Defendant who was close enough to the victim to have shot him. He confirmed that the video recording accurately depicted what he remembered occurring that night. At the close of the State's proof, Defense counsel requested a jury charge of voluntary intoxication based on Parker's testimony that the Defendant had been drinking. The trial court denied the request based on insufficient evidence and stated that "it was very clear [the Defendant] wasn't" intoxicated.

As part of the defense proof, Officer Bryan Toney of the Metropolitan Nashville Police Department testified that he responded to the shooting and helped to preserve the scene and interview witnesses. He specifically interviewed Robert Parker who told him that he heard the commotion from the shooting but did not see exactly what happened. In response, the State called Detective Adam Weeks of the Metropolitan Nashville Police

Department who testified that he responded to the shooting and later spoke with Robert Parker at the police station. On cross-examination, he confirmed that a projectile, but no gun, was recovered from the scene.

**Petition for Writ of Error Coram Nobis.** On September 4, 2015, the Defendant filed a petition for writ of error coram nobis alleging that newly discovered evidence required his conviction be vacated. Specifically, the Defendant asserted that Robert Parker recanted his trial testimony in a chance encounter in the penitentiary and thus the State had insufficient evidence to convict him of first degree murder.[1]

At the October 14, 2015 error coram nobis hearing, the Defendant testified that he was being processed at West Tennessee State Penitentiary when he encountered Robert Parker on February 19, 2014, approximately two weeks after trial. During this encounter, the Defendant claimed that Parker apologized to the Defendant and Parker told the Defendant that Parker "fabricated evidence[,]" lied during his testimony, and tried "to get a mistrial." The Defendant said Parker specifically admitted to lying when he said he was previously incarcerated with the Defendant and that the Defendant was "nipsy" but not drunk on the night of the shooting. The Defendant stated that at least nine other inmates were present and overheard the conversation between the two men. He confirmed that he had not had any contact with those inmates or Parker since the encounter and that he did not "attempt to influence, coerce, intimidate, or [] pressure" them. On cross-examination, the Defendant denied being previously incarcerated with Parker and agreed that Parker testified to the same facts that he told Detective Adam Weeks the night of the shooting. In his petition, the Defendant included the names of nine other inmates who allegedly overheard the conversation between the Defendant and Parker and requested that they be subpoenaed to testify. The trial court continued the hearing and requested defense counsel locate these witnesses and confirm whether they were actually being processed in the West Tennessee State Penitentiary when this encounter occurred.

At the next hearing on November 8, 2016, the Defendant testified consistently with his prior testimony. In addition, he confirmed that he was incarcerated with Charles Jackson, a witness to the encounter between the Defendant and Parker. Jackson testified that he was incarcerated at the West Tennessee State Penitentiary on February 19, 2014, and witnessed the encounter between the Defendant and Parker. He said he overheard Parker apologize to the Defendant and say "I did what I tried to do." He confirmed that he was housed in the same cell as the Defendant for approximately thirty days during this

---

[1] Parker died while in custody prior to the Defendant's error coram nobis hearing. There does not appear to be an official death certificate in the record on appeal; however, exhibit 4 of the Defendant's September 4, 2015 petition for writ of error coram nobis contains a page titled "Felony Offender Information" which indicates that Robert Earl Parker is "deceased."

time.  Asked what Parker said to the Defendant "word for word," Jackson stated, "I'm sorry, man, I did what I -- I did what I could try to do, but I'm sorry, I didn't mean it, I'm sorry[.]"

In a January 6, 2017 order denying the Defendant's petition for writ of error coram nobis, the trial court found that the Defendant's proof was insufficient to warrant relief. The trial court found that only the Defendant testified that Parker fabricated evidence and lied in his trial testimony; whereas Jackson testified that Parker only apologized to the Defendant.  The trial court found the Defendant's testimony to be incredulous and stated that, even if the Defendant's recitation of Parker's statements was accurate, it did not rise to the level of recantation warranting a new trial.  The court further found that the Defendant failed to establish the required elements for error coram nobis relief and that there was "no reasonable probability that the result of the proceeding would have been different in light of the other evidence—including video footage—against" the Defendant.

It is from these judgments that the Defendant now timely appeals.

**ANALYSIS**

On appeal, the Defendant argues that the trial court erred in denying his petition for writ of error coram nobis and in declining to give a jury charge of voluntary intoxication.  The State responds that the trial court properly denied the Defendant's error coram nobis petition and that the evidence did not support a jury charge of voluntary intoxication.  Upon review, we agree with the State.

**I. <u>Denial of Petition for Writ of Error Coram Nobis.</u>**  The Defendant argues that the trial court erred in denying his petition for error coram nobis because newly discovered evidence would have resulted in a different outcome at trial.  The Defendant specifically asserts that Robert Parker recanted his testimony after trial and, without that testimony, he would not have been convicted of first degree murder.  The State responds that the Defendant's newly discovered evidence constitutes inadmissible hearsay and that, even if this evidence were admitted, it would not have altered the Defendant's verdict.

A writ of error coram nobis is an "<u>extraordinary</u> procedural remedy" available to convicted defendants that "fills only a slight gap into which few cases fall."  <u>State v. Mixon</u>, 983 S.W.2d 661, 672 (Tenn. 1999) (citing <u>Penn v. State</u>, 670 S.W.2d 426, 428 (Ark. 1984)); <u>State v. Workman</u>, 111 S.W.3d 10, 18 (Tenn. Crim. App. 2002); <u>see also</u> T.C.A. § 40-26-105(a) (2006).  Relief by petition for writ of error coram nobis is

provided for in Tennessee Code Annotated section 40-26-105. The statute provides, in pertinent part:

> (b) The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

T.C.A. § 40-26-105(b). To seek coram nobis relief, the petitioner must establish that he or she was "'without fault' in failing to present the evidence at the proper time." Harris v. State, 102 S.W.3d 587, 592-93 (Tenn. 2003). A petitioner is "without fault" if he or she is able to show that "the exercise of reasonable diligence would not have led to a timely discovery of the new information." State v. Vasques, 221 S.W.3d 514, 527 (Tenn. 2007). The coram nobis court will then determine "whether a reasonable basis exists for concluding that had the evidence been presented at trial, the result of the proceedings might have been different." Id. "The decision to grant or deny a petition for the writ of error coram nobis rests within the sound discretion of the trial court, and this court's review of this issue is limited to determining whether the trial court abused its discretion." State v. Hall, 461 S.W.3d 469, 496 (Tenn. 2015) (citing Harris v. State, 301 S.W.3d 141, 144 (Tenn. 2010)). "A court abuses its discretion when it applies an incorrect legal standard or its decision is illogical or unreasonable, is based on a clearly erroneous assessment of the evidence, or utilizes reasoning that results in an injustice to the complaining party." Wilson v. State, 367 S.W.3d 229, 235 (Tenn. 2012) (citing Wright ex rel. Wright v. Wright, 337 S.W.3d 166, 176 (Tenn. 2011)).

Here, the Defendant asserts that he had a conversation with trial witness Robert Parker after trial wherein Parker told the Defendant he was sorry and that his testimony at trial was false. The Defendant attempts to bolster his argument with testimony from a fellow inmate, Charles Jackson, who allegedly overheard Parker and the Defendant talking. The Defendant argues that there was "no evidence of any confrontation, aggravation, or aggression" which would place Parker in fear and that Parker benefitted from providing false testimony. The Defendant asserts that Parker's testimony was the only proof that he was close enough to the victim to inflict the fatal gunshot wound, and that, without such evidence, he would not have been convicted at trial. The State responds that the Defendant's newly discovered evidence was inadmissible hearsay and

could not be the basis for a new trial. Alternatively, the State asserts that even if the Defendant used Parker's testimony as a prior inconsistent statement for impeachment purposes, there would be no way to comply with Tennessee Rule of Evidence 613(b) (concerning prior inconsistent statements) because Parker is now deceased. The State further asserts that, even if the Defendant were being truthful, the trial court did not find his testimony to be credible and further found that the exclusion of Parker's testimony likely would not have changed the outcome of trial in light of other evidence presented.

We initially note that the trial court used an incorrect standard of review when denying the Defendant's petition for writ of error coram nobis and stated that the Defendant's newly discovered evidence "must have" resulted in a different judgment. See State v. Hart, 911 S.W.2d 371, 374 (Tenn. Crim. App. 1995). However, the Tennessee Supreme Court has clarified that a defendant need only show that the newly discovered evidence "may have" resulted in a different judgment. See Vasquez, 221 S.W.3d 514, 527. Nevertheless, we note, as the trial court did, that this court has long held that "[r]ecanted testimony is looked upon with distrust rather than favor due to the great temptation to strengthen the weak points of the case discovered during the trial by perjury or subornation of perjury." Tyler Wayne Banes v. State, No. 02C01-9508-CC-00249, 1996 WL 218355, at *2 (Tenn. Crim. App. May 1, 1996), aff'd, No. 02C01-9812-CC-00378, 1999 WL 1095646 (Tenn. Crim. App. Oct. 31, 1999) (citing Ross v. State, 170 S.W. 1026, 1028 (1914)). Here, the Defendant's sole proof regarding Parker's alleged recantation was his own testimony. Moreover, Jackson testified that Parker apologized to the Defendant and that Parker said, "I did what I tried to do." Jackson did not testify that Parker said he lied or fabricated evidence.

Even if the Defendant's testimony were true, we conclude that such recantation does not rise to the level of warranting a grant of the writ of error coram nobis or a new trial. Absent Parker's testimony at trial, the State provided sufficient proof to convict the Defendant of first degree murder, most notably the video recording showing the Defendant within arm's reach of the victim when the shooting occurred. Further evidence provided by the State, including eyewitness and potential motive testimony, bolstered the State's argument and was sufficient to support the jury's guilty verdict to the Defendant. The Defendant is not entitled to relief.

**II. Denial of Jury Charge of Voluntary Intoxication.** The Defendant also argues that the trial court erred in declining to provide a jury charge of voluntary intoxication despite evidence that the Defendant allegedly drank enough alcohol to affect his state of mind. The State responds that the trial court properly exercised its discretion and that there was insufficient evidence to support including this jury charge.

The right to trial by jury is guaranteed by the United States and Tennessee Constitutions. U.S. Const. amend. VI; Tenn. Const. art. I, § 6. "[I]t follows that a defendant has a right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000) (citing State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990)). Trial courts have a duty to give "a 'complete charge of the law applicable to the facts of a case.'" State v. James, 315 S.W.3d 440, 446 (Tenn. 2010) (quoting State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)). When reviewing challenged jury instructions, we must look at "the charge as a whole in determining whether prejudicial error has been committed." In re Estate of Elam, 738 S.W.2d 169, 174 (Tenn. 1987) (citation omitted); see State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). "'An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law.'" State v. Majors, 318 S.W.3d 850, 864-65 (Tenn. 2010) (quoting State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005)); see State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997) (citing State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995); Graham v. State, 547 S.W.2d 531, 544 (Tenn. 1977)). "The misstatement of an element in jury instructions is subject to constitutional harmless error analysis." Faulkner, 154 S.W.3d at 60 (citing Pope v. Illinois, 481 U.S. 497, 501–03 (1987)). Because questions regarding the propriety of jury instructions are a mixed question of law and fact, the standard of review is de novo with no presumption of correctness. State v. Smiley, 38 S.W.3d 521, 524 (Tenn. 2001).

Voluntary intoxication "is admissible in evidence, if it is relevant to negate a culpable mental state." T.C.A. § 39-11-503(a). "Proof of voluntary intoxication is therefore akin to proof of a mental disease or defect that prevents a defendant from forming the culpable mental state required for the offense under consideration." State v. Hatcher, 310 S.W.3d 788, 814 (Tenn. 2010). "However, '[p]roof of intoxication alone is not a defense to a charge of committing a specific intent crime nor does it entitle an accused to jury instructions . . . ; there must be evidence that the intoxication deprived the accused of the mental capacity to form specific intent.'" Id. (footnote omitted) (quoting Harrell v. State, 593 S.W.2d 664, 672 (Tenn. Crim. App. 1979), perm. app. denied (Tenn. Jan. 28, 1980)); see also, Ben Mills v. State, No. W2005-00480-CCA-R3-PC, 2006 WL 44381, at *8 (Tenn. Crim. App. Jan. 5, 2006) ("[W]hile intoxication is not in itself a defense to prosecution, a defendant's intoxication, whether voluntary or involuntary, is admissible in evidence if it is relevant to negate a culpable mental state."), perm. app. denied (Tenn. May 1, 2006).

Here, the Defendant argues that Parker's testimony that the Defendant was "nipsy" and video evidence of him holding an alcoholic beverage was sufficient to support the inclusion of a jury charge of voluntary intoxication. The Defendant asserts that the trial

court erred in not including this charge and thus "fail[ed] to fairly submit the full legal issues to the jury." The State responds that the trial court properly found that there was insufficient evidence to support inclusion of this jury charge, asserting that the video did not show the Defendant having trouble walking or standing and that there was insufficient proof of intoxication sufficient to negate the Defendant's specific intent.

Upon review, we conclude that there was insufficient evidence presented at trial to support a jury charge of voluntary intoxication. The video recording shows the Defendant ordering one beer approximately ten minutes before the shooting. The Defendant did not appear to be swaying or stumbling throughout the video recording. The only other proof of the Defendant consuming alcohol was the testimony of Robert Parker who said the Defendant appeared "nipsy" but not drunk. There is no further indication in the record and the Defendant provides no further proof that he was so intoxicated that he lacked the culpable mental state required for first degree murder because of voluntary intoxication. See Hatcher, 310 S.W.3d at 815 ("The determinative question is not whether the accused was intoxicated, but what was his mental capacity."). Therefore, because the Defendant failed to present any evidence that his intoxication negated his culpable mental state, we conclude that the trial court did not err in declining to provide a jury charge of voluntary intoxication. He is not entitled to relief.

## CONCLUSION

Based on the foregoing reasoning and analysis, the judgments of the trial court are affirmed.

_____
CAMILLE R. MCMULLEN, JUDGE